In re the MARRIAGE OF Dwayne Dean CALLAHAN and Roberta Jane Callahan.

Upon the Petition of Dwayne Dean CALLAHAN, Appellee, and Concerning Roberta Jane CALLAHAN, Appellant.

No. 56469.

Supreme Court of Iowa.

Jan. 16, 1974.

R. Fred Dumbaugh, Cedar Rapids, for appellant.

Robert M. Fassler, Cedar Rapids, for appellee.

Harry R. Terpstra, Cedar Rapids, for children.

Heard before MOORE, C. J., and MASON, REES, UHLENHOPP and HARRIS, JJ.

UHLENHOPP, Justice.

This appeal in a marriage dissolution proceeding involves the custody of the two minor children of Dwayne Dean and Roberta Jane Callahan.

The parties were married when Dwayne was 19 and Roberta was 15. Two children were born to them: Patricia in 1963 and Michael in 1968. Dwayne first worked for Roberta's father, selling hearing aids. He thereafter worked at construction in order to make more money. Following that he worked in a grocery store, and still later he took management training with S.S. Kresge Company.

At the time of trial in April 1973, Dwayne had worked for Kresge seven years, moving up at various stores to co-manager of the K–Mart in Cedar Rapids, Iowa, at an annual salary of $12,000.

Dwayne worked hard. His job consumed considerable time and energy, although he spent some time with the family. Roberta did well as a housewife and mother. The family was quite closely knit.

Eventually Roberta became dissatisfied and depressed about her situation. She thought Dwayne was overly concerned about his work and material things. Dwayne dates the change from a visit by Roberta's older sister in 1972. He testified:

Q. When your wife's older sister visited with you did she make any statement as to what her attitudes were? What her sister's attitudes were? A. Yes. Well that people in life should be able to do their own thing and that you should live not—materialistic things were kind of a crazy idea of society.

Q. I see. And did—where did the older sister live, if you know? A. She lived in Vermont, I guess you would call it sort of a commune, where everybody supported themselves. They made things and they sold them to get money.

From then on, Roberta's pattern of life changed. Her housekeeping slipped, as did her care and supervision of the children. She was unhappy about her lot in life. She tried baby-sitting in her home for neighbors' children in addition to her own, but that did not fill her need.

Roberta decided to take the children and leave. Dwayne tried to dissuade her, offered to quit his job, and asked her to consult a marriage counselor with him, all to no avail. In May 1972, she took the children and went to her parents in Winterset, Iowa. The next month she took the chil-

dren to California, where she lived with another sister in a trailer. She had various jobs there, from sorting peaches to factory work in a glass plant.

While in California, Roberta became acquainted with a man named Wayne. Dwayne testified without objection that when he was with Michael later, this occurred:

Q. Now during the time you were with Michael, did anything that you regarded as unusual occur? A. Well, there was several things. One thing in particular. We were doing some water coloring. And I said, "Excuse me, Michael, I'm going to get a cigarette." And he said, "Wayne makes his own cigarettes." I says, "Oh." I says, "Well, what does he make them out of?" He says, "Dried up grass." I says, "Oh, who smokes these cigarettes after Wayne makes them?" He says, "Mommy and Wayne."

And also:

Q. Did your son make any other statements concerning this person by the name of Wayne? A. Yes. He called me Wayne several times, which kind of hurt. And I asked him how—I knew he got a Big Wheel Ride'm toy for Christmas. I asked him how he liked his Big Wheel. He says, "My Big Wheel is at Wayne's." He made this statement, his Big Wheel was at Wayne's several times. And one time I says, "Well, why is your Big Wheel at Wayne's?" And he says, "Because, I stay there sometimes." I says, "Well, what do you mean stay there?" He says, "I sleep there." I said, "Well you sleep there. Who all sleeps there?" He said, "Mommy sleep there too."

See State v. Schurman, 205 N.W.2d 732, 735 (Iowa) ("Relevant evidence admitted without proper objection, and not excluded on a motion to strike, has the same effect as though it were admissible even though it might have been excluded under the rules of evidence.").

Later in the trial Roberta testified:

Q. Now while you were out in California you made an acquaintance by the name of Wayne, did you? A. Yes.

Q. And I think Michael's Big Wheel resided at Wayne's home. A. Uh-huh.

Q. Why? A. Because it wasn't— the trailer court didn't have enough sidewalk space for him to ride and because on two or three occasions Wayne watched Michael for me while I was working, and it was ideal for him to ride his Big Wheel.

Q. What sort of a place did Wayne live at? A. It was a rural—it was a farm.

Q. Now I think there was some implication, at least from the testimony, that Michael had observed you and Wayne smoking home-rolled cigarettes. . . . You wouldn't have happened to have been smoking a little marijuana, would you? A. No.

Q. Did Wayne roll his own cigarettes? A. Occasionally.

Q. Would you smoke them occasionally? A. If I was out of my own, yes.

Dwayne frequently wrote and called Roberta while she was in Winterset and in California, seeking reconciliation—sometimes two letters a day. Eventually he sought to get her to return the children, and she did send Patricia to him on June 26, 1972.

Thereafter Dwayne took care of Patricia in the family home in Cedar Rapids, and he cared for her well. Roberta had Michael in California.

On November 9, 1972, after Dwayne became convinced that the marriage had irretrievably broken down, he commenced the present proceeding for dissolution and sought custody of the two children. Roberta also asked for custody.

Roberta returned to Iowa, where she worked for her father in a marina on Lake

**136**

Rathbun, earning about $80 weekly. Whether she intends to return to California when this litigation is concluded is not clear. At time of trial, Dwayne still had custody of Patricia, and Roberta had Michael.

The trial court dissolved the marriage, divided the property, awarded Roberta $1,500, allowed her suit money, and granted custody of the children to Dwayne subject to liberal visitation by Roberta. Roberta appealed, asking us to grant her custody of the children.

We are thus again confronted with the difficult problem of custody of children as between two parents. Both of these parents love the children, and. the children love the parents. We are satisfied that if granted custody, each parent, according to his or her ability, would endeavor to do well for the children.

■■ Generally we do not favor divided custody of children, and we think this sister and brother should be permitted to grow up together. Wells v. Wells, 168 N. W.2d 54 (Iowa). Too, we generally infer that the mother is the better choice in the case of small children, but the inference yields to evidence tending to show otherwise. In re Marriage of Jennerjohn, 203 N.W.2d 237 (Iowa). No hard and fast rule governs which parent should have custody. Kayser v. Kayser, 164 N.W.2d 95 (Iowa). We always return to the children's best interests under the particular circumstances. Miller v. Miller, 202 N.W. 2d 105 (Iowa).

In a sense these two children are among the more fortunate ones in dissolution cases—both parents want them and either parent would endeavor to do a creditable job of rearing them. The ultimate question is, which parent will do better? We have deliberated at length on that question.

■ In these dissolution cases, a court is greatly helped in making a wise decision about the parties by listening to them and watching them in person. The trial court

did so, and then arrived at the conclusion that the children's welfare would be better served with the father. Although we are not bound by a trial court's findings, we give them weight. In re Marriage of Williams, 199 N.W.2d 339 (Iowa).

■ We have carefully weighed the factors shown by the evidence and also the findings of the trial court. While we do not intend to commend Dwayne for being materialistic, if he is materialistic, we believe we see signs of instability, immaturity, and selfishness in Roberta in uprooting the children and removing them from the home under the circumstances which existed. At least, the evidence is such that we do not feel justified in disturbing the decision of the trial court which observed the parties. We hold that the decree should stand. See In re Marriage of Forest, 201 N.W.2d 728 (Iowa); Carey v. Carey, 211 N.W.2d 342 (Iowa).

Roberta is allowed $1,000 of Dwayne to apply on her attorney fees in connection with this appeal.

Affirmed.