# IN THE COURT OF APPEALS OF IOWA

No. 16-1574
Filed October 11, 2017

IN RE THE MARRIAGE OF GEORGE THOMAS DAVIS III
AND LIZETH MARIE BARCELO AVILES

Upon the Petition of
GEORGE THOMAS DAVIS III,
    Petitioner-Appellee,

And Concerning
LIZETH MARIE BARCELO AVILES,
    Respondent-Appellant.

_____

    Appeal from the Iowa District Court for Polk County, Rebecca Goodgame Ebinger, Judge.


    Lizeth Barcelo appeals the custody, property distribution, and attorney fee provisions of the decree dissolving her marriage to George Thomas Davis III. **AFFIRMED AS MODIFIED.**


    Barry S. Kaplan and C. Aron Vaughn of Kaplan & Frese, L.L.P., Marshalltown, for appellant.

    Carmen E. Eichmann of Eichmann Law Firm, Des Moines, for appellee.


    Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**VAITHESWARAN, Presiding Judge.**

Lizeth Barcelo[1] appeals a provision of a dissolution decree granting George Thomas Davis III sole legal custody of the parents' two children. She also challenges various other provisions of the decree.

## I. *Background Facts and Proceedings*

Barcelo and Davis had a short-lived marriage. As Barcelo explains, "[A]lthough the seven days of trial, hundreds of exhibits, and 1200+ page transcript may not suggest it, this was a marriage of only 3+ years." What the voluminous record does suggest is that this was a highly fraught marriage and an equally fraught divorce proceeding.

Following trial, the district court granted Davis sole legal custody and physical care of the children. The court awarded Davis the family home and ordered Barcelo to pay $20,000 towards Davis' trial attorney fee obligation within thirty days of the decree, liquidating assets if necessary. Barcelo moved for enlarged findings and conclusions. The motion was denied, and Barcelo appealed.

## II. *Joint Legal Custody*

The legislature has defined joint legal custody as follows:

"Joint custody" or "joint legal custody" means an award of legal custody of a minor child to both parents jointly under which both parents have legal custodial rights and responsibilities toward the child and under which neither parent has legal custodial rights superior to those of the other parent. Rights and responsibilities of joint legal custody include but are not limited to equal participation

---

[1] Ms. Barcelo Aviles informed the district court she preferred to be referred to as Ms. Barcelo.

in decisions affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction.

Iowa Code § 598.1(3) (2015). "The court may provide for joint custody of the child by the parties." *Id.* § 598.41(1)(a). If the court finds that a party has a history of domestically abusing a spouse, a rebuttable presumption arises against ordering joint custody. *Id.* § 598.41(1)(b); *see also id.* § 598.41(3)(j) (considering "[w]hether a history of domestic abuse . . . exists"). An un-rebutted finding of a history of domestic abuse outweighs any other statutory custody factor. *Id.* § 598.41(2)(c).

In denying Barcelo joint legal custody of the children, the district court relied on "a history of domestic abuse . . . with Ms. Barcelo as the aggressor and Mr. Davis as the victim." The court cited a September 2014 incident in which Barcelo "used a dangerous weapon to assault Mr. Davis in the presence of one of her children." The court stated, "This is a severe and deeply concerning incident, but it is not an isolated event." The court determined, "The [statutory] rebuttable presumption against joint legal custody is therefore applicable." The court further determined the remaining statutory factors militated in favor of "a grant of sol[e] legal custody to Mr. Davis," "[e]ven without the history of domestic violence."

On appeal, Barcelo contends "there is no pattern of documented domestic abuse given that [Davis] submitted little more than the one September incident with regard to allegations of domestic abuse perpetrated by her." To the contrary, Davis testified to several instances of domestic abuse perpetrated by Barcelo.

The September incident acknowledged by Barcelo began outside the parties' home. According to Davis, Barcelo told him "she was going to break out every window of [his] vehicle." She came into the home and "struck the concrete countertop, and then came at" him. He stated, "She swung at me, and she did not hit me with a hammer, but she hit me with her fist holding the hammer." During the incident, the parties' "daughter was underfoot." Davis called the police. A five-year criminal protective order was entered prohibiting contact between Barcelo and Davis. This was followed by the entry of a domestic abuse protective order.

Davis also described an incident in which Barcelo "tried to push [him] down the stairs from behind," another incident in which Barcelo "hit him with a full water bottle in the back of the head," and an incident in which Barcelo "came at" him "swinging her heavy bag, hitting [him] with her heavy bag." He described yet another incident which resulted in a "bruised and scratched bicep," and he testified Barcelo threatened to have him killed.

In sum, Davis testified to multiple assaults by Barcelo. *See* Iowa Code § 236.2 (defining domestic abuse as "assault . . . between family or household members who resided together at the time of the assault"). On our de novo review, we agree with the district court's finding of a history of domestic abuse. This history triggered a rebuttable presumption against joint legal custody.

Barcello argues the presumption was rebutted with "ample evidence . . . that the primary aggressor . . . was [Davis]" or "[a]t the very least . . . both parties were perpetrators of abuse or marital discord." She cites *In re Marriage of Forbes*, 570 N.W.2d 757, 760 (Iowa 1997), in which the Iowa Supreme Court

concluded evidence of mutual abuse rebutted the presumption of a history of domestic abuse by one of the parties.

Barcelo testified to several incidents of domestic abuse by Davis. Over the years, she stated he threw "a coffee cup at [her] head," "grabbed [her] hair and pulled [her] to the ground right in front of [one of the children]," "pushed [her], grabbed [her], bruised [her]," threw "a shoe at [her] head so hard [her] earring fell out," and "threw a phone at [her] head." She also testified to a bruise on her arm caused by Davis when he "grabbed [her] by the arm and shoved [her] to the side," and she described an incident at the Iowa State Fair during which Davis "reached from the driver's side [of her car] and slapped [her] sunglasses off of [her] head." She discussed an incident in which Davis "took a swing at [her,] and [she] ducked, and he broke some shelves." Although she did not call the police following this incident, she testified to otherwise calling them "[s]everal times." The calls from the couple's home were logged in an official database and the log was admitted into evidence without objection. One of the pages contained the following remark: "Lisa, having problem with Toby, has assaulted her but refusing rescue. No weapons."

Barcelo's testimony, if believed, might have been sufficient to rebut the presumption of a history of domestic abuse perpetrated by her. *See Forbes*, 570 N.W.2d at 760 ("[T]he record reflects that the abuse was inflicted by both parties, not just Shane."); *In re Marriage of Ford*, 563 N.W.2d 629, 633 (Iowa 1997) (stating testimony of party opposing finding of history of domestic abuse "certainly convinced the district court and suggests to us that the domestic abuse is no longer a problem" and finding "the presumption against awarding custody to

an abusive spouse has been successfully rebutted"). But the district court found Davis' testimony more credible as to some of the incidents of abuse. Because the court had the opportunity to view the demeanor of the witnesses when testifying, we give weight to this credibility finding. *See Forbes*, 570 N.W.2d at 759.

The court's decision to credit Davis' testimony is also supported by Barcelo's admission to the September 2014 episode involving the hammer, her acknowledgment that she "definitely partook in abusive behavior," and her failure to controvert Davis' remaining allegations of abuse except his assertion that she pushed him down the stairs. Without credible testimony to rebut the presumption of a history of domestic abuse, this factor "outweigh[ed] the consideration of any other factor" in the custody determination. *See* Iowa Code § 598.41(2)(c); *In re Floyd ex rel. Cummings*, No. 02-1009, 2003 WL 558510, at *2 (Iowa Ct. App. Feb. 28, 2003) ("Given the lack of credible evidence to rebut the presumption against an award of joint custody, the trial court properly awarded Tara sole custody of Cassie."). But, even without a history of domestic abuse by Barcelo, we agree with the district court that the children's best interests were served by granting Davis sole legal custody of the children.

Both parties admitted they could not communicate with each other regarding the children's needs. *See* Iowa Code § 598.41(3)(c). Davis characterized the tensions in the marriage as "scary" and testified Barcelo's reactions to even "mundane disagreements" were "emotionally explosive" or geared to the other extreme—"complete silent treatment." He stated, "I think it's pretty much impossible to co-parent with [Barcelo]. There is very little that we

can agree upon, and it is incredibly frustrating." Similarly, Barcelo testified the couple "lacked problem resolution skills, communication." She described the "inability to communicate and resolve issues" and the "inability to move on from that" as "a two-way street." The record is replete with examples of each parent's failure to inform the other of key events or decisions. Without belaboring the point, this factor weighed heavily against a joint custody award.

There is also no question Barcelo failed to support Davis' relationship with the children. *See id.* § 598.41(3)(e). The district court provided a detailed summary of her refusal to adjust her visitation schedule to facilitate the children's participation in a Davis family vacation. This was just one of several examples of non-cooperation. Davis testified Barcelo scheduled medical appointments for the younger child on days and times she knew would be incompatible with his work schedule. She enrolled the older child in a preschool of her choice, without the approval of Davis and, even after a temporary order was entered granting him sole custody of the children, scheduled dental appointments for the children without his knowledge.

We recognize the parents lived close to each other. *See id.* § 598.41(3)(h). But this factor was far outweighed by the cited factors. As the district court stated, "The parents have a complete inability or unwillingness to cooperate in the best interests of the children."

We affirm the district court's grant of sole legal custody of the children to Davis.

### III. Physical Care

Barcelo also contends the district court should have granted her physical care. Davis responds that she failed to preserve error on this issue. We disagree. Physical care was a contested issue at trial and was decided by the district court. The issue is properly before us.

"The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Courts examine the statutory "custody" factors in determining physical care as well as other relevant considerations. *See* Iowa Code § 598.41(3); *In re Marriage of Peake*, No. 08-0131, 2009 WL 138778, at *3 (Iowa Ct. App. Jan. 22, 2009) (considering factors in physical care determination); *see also Hansen*, 733 N.W.2d at 696 ("Although Iowa Code section 598.41(3) does not directly apply to *physical care* decisions, we have held that the factors listed here as well as other facts and circumstances are relevant in determining whether joint physical care is in the best interest of the child.").

In granting Davis physical care of the children, the district court relied on the statutory factors, the fact that the children "thrived in his care during the pendency of this case," and Davis' "strong family support system." On our de novo review, we are not as convinced as the district court that Davis' "strong family support system" gave him an advantage in the physical care determination, in light of Barcelo's equally strong family support system. But we agree the statutory factors discussed above favored physical care with Davis. And, again, we give weight to the court's application of these statutory factors,

given the district court's ability to see and hear the witnesses. *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) ("A trial court deciding dissolution cases 'is greatly helped in making a wise decision about the parties by listening to them and watching them in person.'") (quoting *In re Marriage of Callahan*, 214 N.W.2d 133, 136 (Iowa 1974))). We affirm the grant of physical care to Davis.

## IV.    *Trial Attorney Fees/Property Distribution*

Lisa makes a combined challenge to the district court's property division and its award to Davis of $20,000 in trial attorney fees. Her challenge to the property division is premised in large part on the district court's order requiring her "to liquidate the necessary assets immediately in order to pay this sum to Mr. Davis." Accordingly, we will begin with the trial attorney fee award.

In ordering Barcelo to pay $20,000 towards Davis' attorney fee obligation, the district court stated:

> As noted above, like in [*In re Marriage of Christensen*, No. 11-0332, 2011 WL 4578425, at *4-6 (Iowa Ct. App. Oct. 5, 2011)], the Court has found that Ms. Barcelo did not disclose necessary documents in discovery. Although Mr. Davis was unsuccessful pre-trial in pursuing motions to compel, the evidence at trial demonstrated that Ms. Barcelo had not provided the opposing party with complete, timely, and accurate financial materials. For these reasons, an award of attorney's fees is appropriate. Having reviewed the attorney fee affidavit submitted by Mr. Davis's attorney, and having considered the case as a whole, the Court finds an award of $20,000 in attorney's fees is appropriate.

Barcelo challenged the award in a motion for enlarged findings and conclusions. The motion was argued and decided by a different district court judge than the judge who presided over trial. The posttrial judge concluded, "While the undersigned may not have awarded the amount or method of payment of

attorney fees as did the trial court herein, the undersigned cannot rule that such was an abuse of discretion."

It is well established that *our* review of an award of trial attorney fees is for an abuse of discretion. *See In re Marriage of Francis*, 442 N.W.2d 59, 67 (Iowa 1989). But the same standard does not apply to a district court deciding a posttrial motion for enlarged findings and conclusions, because that court does not sit in an appellate capacity to review the trial court decree. The court is simply charged with deciding whether to change the decree. *See* Iowa R. Civ. P. 1.904(2) ("On motion joined with or filed within the time allowed for a motion for new trial, the findings and conclusions may be reconsidered, enlarged, or amended and the judgment or decree modified accordingly or a different judgment or decree substituted.").

The posttrial court stated it might have changed the attorney-fee provision of the decree but for the abuse-of-discretion standard. We believe the court could have made a change.

In deciding on an attorney fee application, "[t]he controlling factor is ability to pay the fees." *Francis*, 442 N.W.2d at 67 (citing *In re Marriage of Muelhaupt*, 439 N.W.2d 656, 662-63 (Iowa 1989)). "In addition, the fees must be fair and reasonable." *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994).

Barcelo lacked an ability to pay $20,000 in thirty days. She earned about the same annual income as Davis—approximately $63,000—which translated into net monthly income of $3638.51. She had a child support obligation of just under $530 per month and, according to her affidavit of financial status, approximately $2370.50 in personal monthly living expenses. Her savings were

minimal. As the district court essentially acknowledged, the $20,000 award would have required her to invade her pension accounts. Barcelo's financial condition did not support a $20,000 award.

Nor was the award "fair and reasonable." *Id.* The trial court based its decision to award $20,000 on a discovery violation that was previously the subject of a motion to compel filed by Davis—a motion that a pretrial judge denied. We recognize the trial court allowed the introduction of extensive evidence on the discovery violation and, based on that evidence, found "any representation to the" pretrial judge was "not accurate." But, even though pretrial and trial time was expended in correcting the inaccuracies, we cannot say the time amounted to 100 hours at the specified hourly rate of $200. On our review of the trial transcript and Davis' trial attorney fee affidavit and giving Davis' attorney the benefit of the doubt on certain notations in her affidavit, we modify the amount of the award to $6653 in trial attorney fees. *See, e.g.*, *In re Marriage of Christensen*, No. 11-0332, 2011 WL 4578425, at *6 (Iowa Ct. App. Oct. 5, 2011) (reducing $20,000 trial attorney fee award to $5000).

As for the payment time, the thirty-day period has long since expired and Barcelo's motion for a stay on enforcement of the decree was denied by the Iowa Supreme Court. That said, our appellate court docketing system discloses that the obligation remains outstanding. We modify the payment terms to require Barcelo to pay the adjusted sum within two years of the issuance of procedendo in this appeal.

This brings us to Barcelo's challenge to the property division. Her request for the marital home is largely premised on a hope for modification of the physical

care provision of the decree. As we have affirmed that provision, we decline her request.

Barcelo also asserts that some of the retirement or savings accounts were premarital property and not subject to division. *See* Iowa Code § 598.21(5); *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). The district court considered Barcelo's retirement accounts in making the property division but awarded them all to Barcelo. The court's disposition was more favorable to Barcelo than the relief she requested at trial. While noting that her prior employment began before the date of the marriage, she agreed her W-2 forms would seem to show "that the pension [from that employment] accrued during [the] marriage." When asked if she understood the pension needed to be divided equitably, she responded, "That's fine." In light of this testimony, we conclude the district court acted equitably in including the pension accounts in the property division rather than setting a portion of them aside to her before making the division.

## V.    *Appellate Attorney Fees*

Davis seeks an award of $7000 in appellate attorney fees. An award rests within this court's discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). Given the parties' relatively equal incomes, we decline his request.

**AFFIRMED AS MODIFIED.**